**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD/SRN) |
| This Document Relates to: | : | |
| *Joseph Landrieu v. Bayer Corp.* | : | Case No. 02-0160 |

**MEMORANDUM IN SUPPORT OF BAYER'S MOTION FOR DENIAL OF CLASS CERTIFICATION AND FOR SUMMARY JUDGMENT**

Plaintiff Joseph Landrieu is an 80-year-old man with a long list of ailments, including Parkinson's disease. None of his physicians believes that Mr. Landrieu suffered any problems related to his use of Baycol. *See, e.g.*, Deposition of David Myers, M.D. (Ex. A) at 46-47, 52-54 (testifying Baycol helped and did not harm Mr. Landrieu). Moreover, nothing in the evidentiary record suggests that Mr. Landrieu's death is imminent. *Compare* Deposition of Joseph Landrieu (Ex. B) at 133 (Dec. 6, 2006) *with* Status Conference (Dec. 17, 2007) (Ex. C) at 12-13 *and* Status Conference (Nov. 8, 2006) (Ex. D) at 41 (counsel seeking expedited remand on the ground that Mr. Landrieu is dying).

To the contrary, Mr. Landrieu still seeks to serve as a representative of a putative class of Louisiana residents who allegedly were injured by Baycol, or who are at risk of future injury, or who fear future injury. *See* Amended Complaint ¶ 37; *see also* E-mail from M. Moreland to S. Haney (January 7, 2008) (Ex. E) ("I spoke with Mr. Becnel and it is our position that we will not stipulate to dismiss class allegations in the Landrieu lawsuit"). This Court already has ruled that individual issues of fact (among other things)

bar certification of a class in this litigation. *See In re Baycol Prods. Litig.*, 218 F.R.D. 197, 208-09 (D. Minn. 2003). This Court should deny class certification here. *See infra*, Part I.

The Court also should enter summary judgment against Mr. Landrieu and in favor of Bayer. *See infra*, Part II. His claims for strict liability, strict products liability, negligence, redhibition, fraudulent misrepresentation and concealment, and breach of implied warranty should be dismissed as a matter of law because they are not permitted under the Louisiana Product Liability Act, the exclusive vehicle for product liability recovery under Louisiana law. La. Rev. Stat. Ann § 9.2800.51, *et seq*. Mr. Landrieu's remaining claims require proof of causation, and he cannot establish a triable issue of material fact regarding medical causation.

Mr. Landrieu's case rests entirely on the testimony of Dr. Raul Reyes, who mass-produced case-specific expert reports for 546 plaintiffs in this MDL. Here, as in other cases,[1] Dr. Reyes based his opinion on Mr. Landrieu's self-reporting and on speculation that, because Baycol (like other statins) is capable of causing muscle aches, Baycol must have caused Mr. Landrieu to experience muscle aches. *See* Case-Specific Expert Report of Raul Reyes ("Reyes Rep.") (Ex. F) ¶ 7. Dr. Reyes's "expert" opinions are inherently unreliable and should be excluded under Federal Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Without expert proof, Mr. Landrieu's claims fail as a matter of law.

---

[1] *See* Defendants' Motions for Summary Judgment in *Roper v. Bayer Corp.*, *et al.*, No. 03-3140, *Anderson v. Bayer Corp.*, *et al.*, No. 03-2933, and *Ronwin v. Bayer Corp.*, No. 02-0200.

## BACKGROUND

### A. Mr. Landrieu's Medical History

Mr. Landrieu has an extensive history of medical problems, including coronary artery disease (and bypass surgery), hypertension, cervical spondylosis, lumbar disc syndrome, back surgery (spinal fusion at L4-L5), kidney cancer, and Parkinson's disease. Myers Dep. (Ex. A) at 18-19 (coronary artery disease, bypass surgery, hypertension, cervical spondylosis, lumbar disc syndrome, back surgery); Landrieu Dep. (Ex. B) at 31-33 (kidney cancer), 15 (Parkinson's disease).

Mr. Landrieu's musculoskeletal problems began while he was in high school when he suffered head trauma during a football game. Landrieu Medical Records (Ex. G) at NC000046jgl. He had spinal fusion surgery in 1984. *Id.* at DM000031-32jgl. Over the years, he has been troubled by continuing back problems. Landrieu Dep. (Ex. B) at 35 (noting back pain began twenty-five to thirty years ago). He also takes potassium for cramping, a condition he has experienced since he was twenty years old. *Id.* at 102-03.

Mr. Landrieu also has suffered from cardiovascular disease at least since 1990, when he was admitted to the emergency room for angina and underwent an immediate angioplasty. Landrieu Medical Records (Ex. G) at JSMC000021jgl. The angina persisted, prompting physicians to perform bypass surgery. *Id*. at JSMC000139jgl. Due to this history, he has been treated with statins at least since 1997, when Mr. Landrieu was prescribed Zocor. Myers Dep. (Ex. A) at 23.

Dr. David Myers started treating Mr. Landrieu in November of 2000. At the initial visit, Mr. Landrieu complained of "weakness in general." *Id.* at 40:2-41:4. Because Mr. Landrieu's cholesterol was elevated, Dr. Myers prescribed 0.4 mg Baycol. *Id.* at 40:2-43:8. Mr. Landrieu filled that prescription on December 4, 2000. Landrieu Medical Records (Ex. G) at WP000001jgl. Baycol reduced Mr. Landrieu's LDL cholesterol to 122, a result Dr. Myers called a "marked improvement." Myers Dep. (Ex. A) at 45:16-23. Mr. Landrieu's liver function tests during the time he was on Baycol were normal. *Id*. at 45:10-12. Mr. Landrieu did complain of back pain in March of 2001 – but it is undisputed that his back problems predated his use of Baycol. *Id.* at 44:5-14. *See also* Deposition of Raul Reyes (Ex. H) at 56-57. Mr. Landrieu never complained of leg pain or weakness during the time he was on Baycol. *See, e.g.*, Myers Dep. at 46:8-24; 53:12-54:17. Nor did he complain of anxiety, dark urine, or discoloration of his left leg, *id.*, purported symptoms that Mr. Landrieu now attributes to Baycol. Landrieu Dep. (Ex. B) at 73; Plaintiff's Fact Sheet (Ex. I) at 18. Indeed, Mr. Landrieu saw a dermatologist, Dr. Emil Koretzky, for a biopsy of a lesion in his left leg in August 2001. Landrieu Medical Records (Ex. G) at DM000022jgl. When Dr. Koretzky wrote to Dr. Myers (who had referred Mr. Landrieu to him) about Mr. Landrieu's appointment, he did not mention any discoloration or other skin changes in the leg. *Id*.

In May of 2001, Mr. Landrieu had a heart attack followed by additional stent placement. *Id.* at DM000002jgl. He saw cardiologist Edward St. Martin during June and made no mention of muscle aches or weakness. *Id*. at ESM000024jgl. Mr.

Landrieu remained on Baycol until the medication was withdrawn in August 2001, at which time he was placed on Lipitor. *Id*. at WP000003jgl. He switched back to Zocor in 2003. *See id.* at FO000016jgl.

Starting in October of 2001, Mr. Landrieu began seeing a new doctor, Joseph Bobrowski. During their first visit, Mr. Landrieu complained of hand tremor and neck stiffness. Deposition of Joseph Bobrowski, M.D. (Ex. J) at 27. Mr. Landrieu expressed concern that he had symptoms of Parkinson's disease. Landrieu Medical Records (Ex. G) at JB000011jgl. However, he resisted a neurology referral at that time. *Id*. at JB000014jgl. Laboratory tests from that appointment show a normal CK level. *Id.* at JB000008jgl.

In late November, Mr. Landrieu and his wife again saw Dr. St. Martin. *Id.* at ESM000022jgl. At that visit, Mrs. Landrieu asked if Mr. Landrieu's weakness, shuffling gait and weak voice could be attributed to Baycol. *Id*. Dr. St. Martin listed a diagnosis of Parkinson's disease. *Id*.

The Parkinson's disease diagnosis was confirmed in December 2001 by neurologist Frank Oser. *Id.* at FO000004-5jgl. At this appointment, Dr. Oser asked Mr. Landrieu about back or leg pain, and Mr. Landrieu reported only arthritis in his lower back. Deposition of Frank Oser III, M.D. (Ex. K) at 15:6-23, 17:13-18:6. Dr. Oser also asked about muscle weakness, but Mr. Landrieu reported none. *Id.* at 15:6-16:6.

In April 2006, Mr. Landrieu was diagnosed with renal cell carcinoma, or kidney cancer. *Id.* at AJC000011jgl. He underwent surgery and radiation treatment. *Id.* at AJC000011-12jgl, AJC000001jgl. He continues to be monitored by his doctors, but

there is no indication that the cancer has returned. *See id.* at AJC000001jgl (noting that Mr. Landrieu "recovered well" from kidney surgery and radiation therapy).

**B. This Lawsuit**

Mr. Landrieu filed this lawsuit on November 1, 2001, alleging the following causes of action: (1) strict liability and strict products liability; (2) design defect; (3) failure to adequately warn; (4) negligence; (5) redhibition; (6) fraudulent misrepresentation and concealment; (7) breach of implied warranty; and (8) breach of express warranty. *See* Amend. Compl. ¶ 24. He purports to represent a class of all Louisiana residents who have taken Baycol and (a) suffered an injury or damage or (b) may suffer future injury or damage or (c) have a justifiable fear of sustaining future injury or damage. *Id.* ¶ 37. Among the remedies he seeks is medical monitoring. *Id.* ¶¶ 35-36.

Mr. Landrieu's Plaintiff Fact Sheet ("PFS") alleges that he suffered "extreme weakness in leg muscles," memory loss, confusion, and anxiety as a result of taking Baycol. *See* PFS (Ex. I) at 13, 18. At his deposition, Plaintiff testified that while he was on Baycol, his urine turned "real dark" and his left leg turned dark brown. Landrieu Dep. (Ex. B) at 73:2-7. He testified that he makes no other claims of injury from Baycol. *Id.* at 72:18-73:9.[2]

---

[2] Mr. Landrieu asserted in a 2004 letter that Baycol caused his heart attack, permanently damaged his kidneys, and left him with physical weakness. Landrieu Medical Records (Ex. G) at NC000056jgl. In addition to that letter, the files of neurologist Patricia Smith Cook, M.D., contain a note from Mrs. Landrieu claiming that Baycol "advance[d] the symptoms" of Mr. Landrieu's Parkinson's disease. *See id.* at NC000038jgl. Dr. Smith Cook rejected that suggestion, noting that any symptoms Mr. Landrieu claims to have

Mr. Landrieu relies upon the opinion of Dr. Raul Reyes, who provided "expert" reports for 546 plaintiffs in this MDL. *See* Reyes Rep. (Ex. F). Dr. Reyes visited with Mr. Landrieu on May 15, 2004 for ten or fifteen minutes. Reyes Dep. (Ex. H) at 37. He did not examine Mr. Landrieu, but merely reviewed with Mr. Landrieu a medical history prepared by Dr. Reyes's accountant. *Id.* at 36-39. Based on that interview, Dr. Reyes concluded that Mr. Landrieu suffered from "myalgia, progressive muscle weakness, and cramps while on Baycol." *See* Reyes Report (Ex. F) ¶ 6.

## ARGUMENT

## I. CLASS CERTIFICATION SHOULD BE DENIED.

Class certification should be denied. Only if plaintiff could establish all of the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – and demonstrate that a class could be maintained under Rule 23(b)(3) – by proving that common issues of fact and law predominate and that class litigation is superior – could a class be certified. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). Plaintiff cannot do so here because, among other things:

- The claims in this case raise predominantly individual questions of fact. This Court and numerous other courts have rejected certification of class actions in prescription pharmaceutical cases due to the predominance of individual issues. *See In re Baycol Prods. Litig.*, 218 F.R.D. at 207-14.

---

experienced while on Baycol ***may actually have been early signs of Parkinson's***. *Id.* Mrs. Landrieu conceded during her deposition that no physician has told her that Baycol had anything to do with her husband's Parkinson's disease. Deposition of Phyllis Landrieu (Ex. L) at 30-31. *See also* Reyes Dep. (Ex. H) at 51-52, 61-66 (declining to link Baycol with Mr. Landrieu's heart attack, putative kidney damage, or Parkinson's disease).

- Plaintiff is not typical of, or an adequate representative for, the absent class members. *See id*., at 205-06, 211, 214.

**A. Individual Issues Predominate.**

As this Court has previously ruled, product liability class actions such as this one are inappropriate for certification due to the predominance of individual issues. *In re Baycol Prods. Litig.*, 218 F.R.D. at 208-09. That decision was and is consistent with the great weight of authority. *See, e.g.*, *Zehel-Miller v. Astrazenaca Pharms., LP*, 223 F.R.D. 659, 662-64 (M.D. Fla. 2004) (denying certification of putative class of all "persons who purchased and/or ingested Seroquel" as "manifestly inappropriate"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) (rejecting personal injury, refund, and medical monitoring classes); *In re Phenylpropanolamine ("PPA") Prods. Liab. Litig.*, 208 F.R.D. 625 (W.D. Wash. 2002) (rejecting injury, risk of injury, fear of injury, and refund classes). "No matter how you cut it, cube it, or slice it," there is no way to untangle the individual issues of fact surrounding causation and damages in a personal injury class action related to pharmaceutical medications. *In re Prempro*, 230 F.R.D. 555, 573 (E.D. Ark. 2005); *In re Baycol Prods. Litig.*, 218 F.R.D. at 205-10; *Rezulin*, 210 F.R.D. at 66-68. Consequently, "[t]o date, no Court of Appeals decision has approved class certification of an action involving prescription drugs." *Sweet v. Pfizer*, 232 F.R.D. 360, 372-73 (C.D. Cal. 2005) (*quoting In re Baycol Prods. Litig*., 218 F.R.D. at 204). The Court therefore should reaffirm its prior ruling and reject this putative class.

Plaintiff's claims illustrate the inherently individualized nature of the inquiry and the applicability of this Court's prior ruling denying certification. Mr.

Landrieu took 0.4 mg Baycol starting in December 2000. *See* Landrieu Medical Records (Ex. G) at WP000001-2jgl; Myers Dep. (Ex. A) at 40:2-42:16. Absent class members took different doses of Baycol for different periods of time, had different pre-existing conditions, reported different symptoms at different points in time after initiating (or ceasing) Baycol therapy, were prescribed Baycol when different labels were in effect, and took Baycol in combination with different medications. *See In re Baycol Prods. Litig.*, 218 F.R.D. at 205-06. These and other differences between plaintiff's claim and those of absent class members could be listed "*ad infinitum*." *Rezulin*, 210 F.R.D. at 69.

Further, injury and causation can only be established in these cases on a plaintiff-by-plaintiff basis. Mr. Landrieu alleges a shifting assortment of injuries, including "extreme weakness," memory loss, confusion, anxiety, dark urine, and discoloration of his left leg, heart attack, kidney damage, and exacerbation of his Parkinson's Disease (which was diagnosed after he stopped taking Baycol). *See* PFS (Ex. I) at 18; Landrieu Dep. (Ex. B) at 73; Landrieu Medical Records (Ex. G) at NC000056jgl. This particular collection of alleged injuries is unlikely to correspond to the injuries alleged by any other member of the putative class. Moreover, a determination that Mr. Landrieu's purported weakness was due to his heart condition and Parkinson's Disease, and not due to Baycol, would shed no light on whether any other member of the putative class suffered a Baycol-related injury. *Amchem*, 521 U.S. at 624

(explaining that disparate medical histories complicate causation inquiries, rendering class actions inappropriate).[3]

The predominance of individual issues is not mitigated by the fact that Louisiana law would apply to all putative class members' claims. To recover under the Louisiana Products Liability Act ("LPLA"), plaintiff must show that an unreasonably dangerous product proximately caused his damages, the precise requirement that this Court found to be highly individualized and a bar to class certification. *See* La. Rev. Stat. § 2800.54 A, *Cont'l Ins. Co. v. Laneco Const. Sys. Inc.*, 1996 WL 344205, *2 (E.D. La. June 20, 1996). The Court therefore should deny certification of this putative class because individual issues overwhelm any common questions.

### B. Mr. Landrieu Is Not an Adequate or Typical Representative of the Putative Class.

Class certification also should be denied under the adequacy and typicality requirements of Rule 23(a). To be an adequate class representative, a party asserting claims on behalf of a putative class must be able to "fairly and adequately protect the

---

[3] Proof of injury and causation are requirements to obtain medical monitoring under Louisiana law. *See* La. Civ. Code Ann. art 2315. Because individual issues predominate with respect to injury and causation, the availability of medical monitoring could not be adjudicated on a classwide basis. Moreover, this Court already has determined that medical monitoring in and of itself "destroy[s] the cohesive nature of the class claims" because it requires a case-by-case analysis of the past and present medical history of each class member. *In re Baycol Prods. Litig.*, 218 F.R.D. at 211; *Zehel-Miller*, 223 F.R.D. at 663-64. "[E]ach plaintiff's need (or lack of need) for medical monitoring is highly individualized." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005) (reversing certification of medical monitoring class as abuse of discretion). "[I]ndividual questions concerning patient characteristics and medical history, physician involvement, dosage, causation, and comparative or contributory negligence, eviscerate any notion that common issues predominate" among members of a putative medical monitoring class. *Zehel-Miller*, F.R.D. at 664.

interests of the class." *See* Fed. R. Civ. Proc. 23(a); *In re Gen. Am. Life Ins. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004). The related requirement of typicality "determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (citation omitted); *accord Jones v. Allercare, Inc.*, 203 F.R.D. 290, 299-302 (N.D. Ohio 2001).

At a minimum, a person seeking to represent a class "must be part of the class and possess the same interest and suffer the same injury as the class members." *See Amchem*, 521 U.S. at 625-626 (internal quotations omitted). A person who claims to be "currently injured" cannot represent persons who experienced "exposure only" and do not allege present injuries. *See Amchem*, 521 U.S. at 626; *Foster v. St. Jude Med. Inc.*, 229 F.R.D. 599, 604 (D. Minn. 2005). Furthermore, when an "injury can only be determined on an individual basis," and "is tied to a complex course of conduct engaged in by a defendant over a long period of time," factual differences in the claims and defenses of the putative class mean that no one person's claims are "typical." *In re Baycol Prods. Litig.*, 218 F.R.D. at 206.

Here, plaintiff cannot be everything to everyone. Since Mr. Landrieu seeks recovery for his alleged personal injuries, he is not an adequate representative for persons who contend only that they are at risk of future injury or who fear they are at risk of future injury. Amend. Compl. ¶ 37 (class definition). *See Amchem*, 521 U.S. at 626; *Foster*, 229 F.R.D. at 604. Mr. Landrieu cannot pursue medical monitoring because,

according to his own expert's testimony, he did not suffer a permanent injury as a result of using Baycol and will not require follow-up for any Baycol-related injury. Reyes Dep. (Ex. H) at 70-71. Regardless of what claims or relief Mr. Landrieu pursues, his individual claims will raise legal and factual issues distinct from those of absent class members. *See supra*, Argument, Part. I.A.

In short, plaintiff faces the same obstacle encountered by other plaintiffs in pharmaceutical products liability actions: his unique experiences on Baycol do not qualify him to represent a class of persons who also had unique experiences on Baycol. *In re Baycol Prods. Litig.*, 218 F.R.D. at 211; *accord Blain v. SmithKline Beecham Corp.*, 240 F.R.D. 179, 187-189 (E.D. Pa. 2007). For all of the foregoing reasons, the Court should deny certification due to the overwhelming predominance of individual issues, the lack of typicality, and the lack of adequacy.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF BAYER AND AGAINST MR. LANDRIEU.

The Court also should grant summary judgment in favor of Bayer and against Mr. Landrieu as to his individual claims. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, do not raise a genuine issue of material fact supporting plaintiffs' claims. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, a plaintiff fails to make a showing sufficient to establish the existence of an essential element of his claims on which he will bear the burden of proof, summary judgment should be granted in favor of the defendants. *See Celotex*, 477 U.S. at 324-25.

Plaintiff's claims are limited to those recognized under the Louisiana Product Liability Act ("LPLA"). *See* La. Rev. Stat. Ann. 9 § 2800.52 (2007) (LPLA "establishes the exclusive theories of liability for manufacturers for damages caused by their products"). A "claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter." *See* La. Rev. Stat. 9:2800.52; 55-58 (listing exclusive theories of liability); *Jenkins v. Int'l Paper Co.*, 945 So. 2d 144, 147 (La. Ct. App. 2006) (same). Plaintiff's claims for strict liability, strict products liability, negligence, redhibition, fraudulent misrepresentation and concealment, and breach of implied warranty should be dismissed as a matter of law because they are not recognized under the LPLA.

Each of the remaining claims recognized under the LPLA – defective product design, defective product composition, failure to adequately warn, and breach of express warranties – requires proof of injury and causation. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342 (5th Cir. 1994) (applying Louisiana law, "A plaintiff must prove not only causation in fact, but also that the product defect was 'the most probable cause' of the injury" to recover under the Louisiana Product Liability Act).

Specific causation must be proven through expert testimony. *See In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1126 (D. Minn. 2004); Pretrial Order 114. The standard under Louisiana law is clear: Plaintiff must put forth expert evidence from which the factfinder could conclude that Baycol was more likely than not the cause of his alleged injuries. *Foster v. AFC Enter., Inc.*, 896 So. 2d 293, 296 (La. Ct. App. 2005) ("more likely than not" standard applies under Louisiana law). A mere *possibility* that a

defendant's conduct caused an alleged injury is insufficient to create a triable issue of fact. *See Davis v. Wal-Mart, Inc.*, 594 So. 2d 557, 565 (La. Ct. App. 1992). Mr. Landrieu's claims fail because he cannot prove that Baycol is more likely than not the cause of his alleged injuries.

### A. Mr. Landrieu's Treating Physicians Testified that He Did Not Sustain a Baycol-Related Injury.

Mr. Landrieu is an elderly man with a number of health problems, almost all of which he has attributed to Baycol at one time or another. None of his doctors has attributed any of these ailments to Baycol.

Dr. David Myers, who prescribed Baycol, had several office visits with Mr. Landrieu while he was taking the medicine.[4] He saw Mr. Landrieu in March of 2000, a few months after plaintiff started taking Baycol. At that time, Mr. Landrieu complained of back pain, which Dr. Myers testified was the same back pain that Mr. Landrieu had been experiencing for a decade. Myers Dep. (Ex. A) at 44. Dr. Myer specifically testified that Mr. Landrieu did not complain at that time of any of the ailments that he now attributes to Baycol:

> Q. Now, let me ask you some questions about this visit, which is the first one after he apparently started to take Baycol.

[4] Dr. Myers testified that he was aware of the risks of statin-induced muscle problems when he decided to prescribe Baycol for Mr. Landrieu. Myers Dep. (Ex. A) at 43. Thus, even if Mr. Landrieu had suffered Baycol-related muscle aches – and he did not – his claim would be barred by the learned intermediary doctrine. *See Kampmann v. Mason*, 921 So.2d 1093, 1094 (La. Ct. App. 2006) (explaining that drug manufacturer's obligation to the consumer "is fulfilled when the prescribing or treating physician is informed of the risks from the drug use"); *Marks v. OHMEDA, Inc.*, 871 So. 2d 1148, 1157 (La. Ct. App. 2004) (same); *Calhoun v. Hoffman-La Roche, Inc.*, 768 So. 2d 57, 59 (La. Ct. App. 2000) (same).

A. Yes.

Q. There is no indication, is there Doctor, of any rhabdomyolysis?

A. No, sir.

Q. He didn't report any depression to you?

A. No, sir.

Q. He didn't report any dark urine?

A. No, sir.

Q. He didn't report or you didn't find that his left leg turned brown from the knee down?

A. No, sir.

Q. He didn't report any myalgia to you at this time, did he?

A. No.

Q. Or myopathy?

A. No.

Q. In fact, on your physical examination it's probably something you would have noticed if indeed there was truly myopathy?

A. Certainly.

Q. And cramps, no indication of any sort of cramps?

A. No.

Q. ***And so with respect to this visit, there's no indication that Mr. Landrieu was having any sort of symptoms that you would relate to taking Baycol?***

***A. No sir. In fact at this visit from what the record seems to indicate, it looked like we were doing pretty good for a change with respect to his cholesterol and other issues.***

*Id.* at 46-47 (emphasis added).

Dr**.** Myers also saw Mr. Landrieu in May of 2001, right after Mr. Landrieu's heart attack. *Id.* at 52. He conducted a physical examination and found "[n]othing of any note." *Id.* Once again, Mr. Landrieu did not indicate any weakness in his legs, depression, dark urine, rhabdomyolysis, discoloration of his left leg, myalgia, myopathy, or cramps. *Id.* at 53-54. Dr. Myers explicitly testified that Baycol did not harm Mr. Landrieu and in fact helped him:

> Q. Doctor, can you state here as a physician in internal medicine treating Mr. Landrieu that it's more likely than not that Baycol did not cause any sort of problems for Mr. Landrieu?
>
> A. ***I see nothing in the record that would indicate that Baycol caused any problems for him.***

*Id.* at 54 (emphasis added). Dr. St. Martin, Mr. Landrieu's cardiologist, also saw him during the summer of 2001 (while plaintiff was taking Baycol) and in November of that year (three months after plaintiff had discontinued Baycol) and noted no Baycol-related injuries. *See* Landrieu Medical Records (Ex. G) at ESM000024-25jgl, ESM000010jgl.

Dr. Bobrowski, who started seeing Mr. Landrieu in October of 2001, also testified that that "it seems unlikely" that Baycol caused him any problems, considering it more likely that his problems resulted from his osteoarthritis, cervical spondylosis, and Parkinson's disease. Bobrowski Dep. (Ex. J) at 48-49. And Dr. Oser, the neurologist who officially diagnosed Mr. Landrieu's Parkinson's disease in December of 2001, testified that he did not believe Baycol was responsible for any of Mr. Landrieu's

ailments. Oser Dep. (Ex. K) at 38-39. In sum, none of the physicians treating Mr. Landrieu believes that Baycol caused him any problem.

### B. Dr. Reyes's Testimony Does Not Create a Triable Issue of Fact on Injury Causation.

Thus, Mr. Landrieu's case rests entirely on the testimony of his putative expert, Raul Reyes. As a preliminary matter, even Dr. Reyes would not support any claim that Baycol caused Mr. Landrieu to have a heart attack, suffer kidney damage, or cause or contribute to the progression of his Parkinson's Disease. Reyes Dep. (Ex. H) at 61 (heart attack), 65-66 (kidney damage), 51-52, 62-63 (Parkinson's Disease). Dr. Reyes opined only that Mr. Landrieu suffered "myalgia, progressive muscle weakness, and cramps while on Baycol." *See* Reyes Report (Ex. F) ¶ 6. *See also* Reyes Dep. (Ex. H) at 70 (testifying that his opinion was limited to myalgia, progressive muscle weakness and cramps). This opinion should be excluded.

During his deposition in this case, Dr. Reyes conceded his lack of expertise, testifying:

> A. I think that the – what I have experience with is an observation of patients' complaints regarding the medication, and that's the limit of my experience with the statin situation.
>
> Q. With the statin situation, the limit of your experience has been that some patients were referred to you by attorneys. These patients came in and they told you about what complaints they had after they had taken the Baycol medicine, correct?
>
> A. That's correct.

*Id.* at 30.

Where, as here, the putative expert's opinions are formed solely in the context of litigation, with no independent verification as to results or methodology, they must be excluded. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles'"); *see also Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) (deeming expert testimony inadmissible where his opinions were "conceived, executed, and invented" solely in the context of litigation).

Dr. Reyes's opinions have no independent verification as to results; none of Mr. Landrieu's treaters believe plaintiff suffered a Baycol-related injury. *See supra*, Part II.B.[5] Moreover, Bayer already has addressed in detail the fundamental flaws in Dr. Reyes's methodology: his lack of experience with statin-related injuries, his speculation, his reliance on self-reporting, his conflation of general causation with case-specific causation, his failure to conduct differential diagnoses – any one of which would render his opinion unreliable and subject to exclusion. Rather than repeating these arguments, Bayer refers the Court to Bayer's Motion for Summary Judgment in the *Roper* case,

[5] Dr. Reyes testified that he would place great weight on the opinions of Mr. Landrieu's treating physicians, although he did not read them. Reyes Dep. (Ex. H) at 74, 27.

which sets forth these arguments in detail. *See* Defendants' Motion for Summary Judgment, *Roper v. Bayer*, *et al.*, No. 03-3140.[6]

Dr. Reyes ran true to form in arriving at his opinion in this case. He developed that opinion after a 10-15 minute interview with Mr. Landrieu, using a medical history compiled by Dr. Reyes's accountant. Reyes Dep. (Ex. H) at 36-37, 40-41. He did not conduct a physical examination during that interview. *Id.* at 38. Rather, Dr. Reyes explained that he arrived at his opinion that Mr. Landrieu suffered myalgia ***because Mr. Landrieu told him so***:

> Q. Let's talk about myalgia. It says yes here [on the Medical Evaluation Form Reyes used to interview plaintiff]. How did you find out whether or not he had myalgia?
>
> A. He was questioned as to whether or not he had muscle pains, and he stated that he had had muscle cramps and muscle pains, and that was basically the information.

*Id.* at 43. *See also id.* at 45-46 (conceding that a heart attack would be a contributing factor for progressive muscle weakness "*especially if he [Mr. Landrieu] related that*") (emphasis added). It is well established that "[t]he self-reporting of a plaintiff's medical history in preparation for litigation, without additional independent confirmation, is inherently unreliable." *Goeb v. Tharaldson*, 615 N.W.2d 800, 816 (Minn. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994)); *see also Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423 (5th Cir. 1987) (noting that reliance on plaintiff's incomplete oral history alone is an insufficient basis on which to ground an expert

---

[6] Plaintiff's counsel agreed that Dr. Reyes's testimony from other cases about his methodology applied here. Reyes Dep. (Ex. H) at 6-7.

opinion); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 520 (E.D. La. 2002) (same); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1246 (E.D.N.Y. 1985) ("no reputable physician relies on hearsay checklists by litigants to reach a conclusion with respect to the cause of their afflictions") (citing *United States v. Downing*, 753 F.2d 1224, 1238 n.18 (3d Cir. 1985)).

Dr. Reyes could not even testify as to the part of the body in which Mr. Landrieu purportedly experienced myalgia and weakness. Rather, he inferred it was in Mr. Landrieu's legs because "[u]sually when patients complain of myalgia, they usually refer to the upper or lower extremities," but he had no actual recollection of the supposed injury to which he was testifying. Reyes Dep. (Ex. H) at 44-45. *See also id.* at 48 ("Q. What part of his body was he having muscle cramps, do you know? A. No. Most of the time, again, patients complain of cramps in the legs primarily, but they can happen elsewhere. I did not elaborate"). Speculation is not a basis for a reliable expert opinion. *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1128 (D. Minn. 2003) ("Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis") (citing references omitted); *see also J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).

Moreover, during his deposition, Dr. Reyes was forced to concede that:

- Mr. Landrieu was experiencing weakness and pain before he ever took Baycol, Reyes Dep. (Ex. H) at 56-57;

- Mr. Landrieu's cramps cannot be attributed to Baycol because he has suffered from cramps for decades and has taken potassium to treat the condition, *id.* at 73-74;

- Parkinson's disease can cause weakness and progressive muscle-related problems, *id.* at 52;

- A heart attack can cause weakness, *id.* at 45;

- Mr. Landrieu did not experience any kidney damage from Baycol because laboratory tests taken just after he discontinued the medication were normal, *id.* at 65-66; and

- Mr. Landrieu did not experience any muscle damage caused by Baycol because he had a normal CK in October of 2001, *id.* at 65.

These concessions make clear that Dr. Reyes formed his opinion that Mr. Landrieu experienced myalgia caused by Baycol without systematically ruling in and ruling out different potential causes of Mr. Landrieu's ailments; in short, Dr. Reyes did not perform the differential diagnosis necessary to arrive at a reliable and admissible opinion. *See In re Baycol*, 321 F. Supp. 2d at 1124-27; *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (testimony that does not eliminate confounding factors makes opinions inadmissible under *Daubert*); *Krueger v. Johnson & Johnson Prof'l Inc.*, 66 Fed. Appx. 661, 662 (8th Cir. 2003) (failure to address alternative causes of injury rendered testimony unreliable under *Daubert*); *Medalen*, 269 F. Supp. 2d at 1139-40 (excluding expert as unreliable for failing to rule out alternative causes of an alleged injury).

For all these reasons, Dr. Reyes's testimony is precisely the sort of unreliable putative "expert" testimony that this Court, in its gatekeeper function, must exclude under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993). Without Dr. Reyes, plaintiff has no competent evidence in support of his claim that Baycol caused injury – an essential element of his *prima facie* case under Louisiana law. As a result, this Court should grant summary judgment in favor of Bayer, dismissing each of Mr. Landrieu's claims with prejudice.

**CONCLUSION**

For the foregoing reasons, Bayer respectfully requests that this Court deny class certification, dismiss this action with prejudice, and grant summary judgment in Bayer's favor and against Plaintiff.

Dated: January 18, 2008

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
Elizabeth C. Curtin
Elizabeth M. Chiarello
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Peter W. Sipkins (No. 101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

John F. Olinde
Charles P. Blanchard
CHAFFE McCALL LLP
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
(504) 585-7000

*Counsel for Defendant Bayer Corporation*