# Exhibit H
# Part 1 of 2

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re BAYCOL PRODUCTS LITIGATION * MDL NO. 1431
* (MJD)
This Document Relates to: *
*
JOSEPH LANDRIEU, et al. v. * CASE NO.
BAYER CORPORATION, et al. * 02-cv-0160

COPY

Deposition of RAUL G. REYES, M.D., taken at the Law Offices of Chaffe McCall, L.L.P., 2300 Energy Centre, 1100 Poydras Street, New Orleans, Louisiana 70163, on Friday, December 14, 2007.

REPORTED BY:

SIMONE R. BERTUCCI,
CERTIFIED COURT REPORTER
HUFFMAN & ROBINSON, INC.
One Shell Square, Suite 250 Annex
New Orleans, Louisiana 70139

RAUL G. REYES, M.D., 361 West Esplanade Avenue, Kenner, Louisiana 7065, after having been first duly sworn by the above-named Certified Court Reporter, did testify as follows:

EXAMINATION BY MR. OLINDE:

Q. Doctor, first of all, reading and signing of your deposition. Do you want to read and sign?

A. No.

Q. Doctor Reyes, I've spoken with Mr. Landrieu's attorney Matt Moreland here prior to this about the stipulation which is: Your deposition we know has been taken -- I've taken it probably five or six times, and we've gone through at least two or three times your background with respect to your experience and education and also your knowledge concerning Baycol and statin medicines, is that right?

A. Yes.

Q. And really the purpose of that was to determine your expertise with respect to the providing of your opinions in the case. Now what we are going to do for the purposes of this deposition is to have a stipulation that the testimony that you provided in those cases

related to your experience, background, expertise, that those opinions and the testimony that you've provided in those cases can be used for all purposes, even for purpose of trial in this case, okay?

A. Yes.

Q. And two of the depositions -- which we will give Matt here a copy of, I have them but they are marked up. I'll get some copies made for you. The two depositions that I know the background was taken rather extensively are those in the case of Bernel Robinson which was taken on October 13th of 2006 in a Baycol case, and there is also another deposition which was taken in the Houston, David Houston case, which was August 28th of 2007.

MR. OLINDE:

So, Matt, is that our understanding for the stipulation of this deposition?

MR. MORELAND:

That is correct.

MR. OLINDE:

We can adopt the testimony of Doctor Reyes to be used for all purposes?

MR. MORELAND:

That is correct.

MR. OLINDE:

Good. That will cut off some of the time we have here.

EXAMINATION BY MR. OLINDE:

Q. Doctor Reyes, insofar as I know that testimony is concerned with respect to your background and experience and expertise, there is nothing that you recall specifically now that you would want to change with that, is there?

A. No.

Q. You have given us a -- and I've told Matt here that we would do this because we've already gone through your opinions about -- excuse me, your background and experience with statin medicines and Baycol. Since we have done that previously and that's going to be adopted for this purpose, really what I want to do now is simply to kind of go through your history or your background since the last time I think I've taken your background which would have been probably in -- looks like it was in August of this year. So can you tell me, Doctor, just -- well, why don't I give you a copy. I think it's in this little stack that

copy of Mr. Landrieu's deposition?
A. No.
Q. And have you been provided with a copy of the deposition of any of the treating physicians for Mr. Landrieu?
A. Not to my knowledge.
Q. Specifically with respect to the physicians, have you been provided or have you read the deposition of Doctor Frank Oser, O-S-E-R?
A. No.
Q. How about Doctor David Myers, have you read or been provided a copy of his deposition transcript?
A. No.
Q. How about Doctor Joseph Bobrowski B-O-B-R-O-W-S-K-I, have you either been provided a copy of his deposition or have you read it?
A. No.
Q. Since the time of rendering -- providing this expert report which was May 15 of 2004, that's the date on it, since that time have you done anything with respect to the case of Joseph Landrieu?
A. Not to my knowledge.

A. I think that the -- what I have experience with is an observation of patients' complaints regarding the medication, and that's the limit of my experience with the statin situation.
Q. With the statin situation, the limit of your experience has been that some patients were referred to you by attorneys. These patients came in and they told you about what complaints they had after they had taken the Baycol medicine, correct?
A. That's correct.
Q. The statin medicines that you have prescribed you said in the last year, what statin medicines are those?
A. Primarily Lipitor and Pravachol perhaps.
Q. And have you read the package inserts with respect to Lipitor and Pravachol?
A. Yes.
Q. With respect to those -- let's take Lipitor. With respect to the package insert, you're aware that if indeed -- it tells you that if indeed a patient complains of some unexplained muscle pain or weakness, that they should tell you right away?
A. Yes.

A. Yes.
Q. Now this medical history that we have which is two pages, this would indicate, would it not, that at some point you would have seen Joseph Landrieu?
A. Yes.
Q. And the date that you would have seen him would have been May 15, 2004?
A. That's correct.
Q. Do you know whether or not -- there's one called medical history, which is Page 15, and then there's this second page which is the medical evaluation form. Do you know whether or not you have any other notes concerning your visit with Mr. Landrieu other than this?
A. I would not think so.
Q. Now, in looking at this form that we have for Mr. Landrieu, there's some handwriting on this form, and I think we've gone through this before, but maybe you can help me out. As I understand it, Mr. Dugas may have seen Mr. Landrieu initially to try to take a history, and then you would have come in after that.
A. Yes.
Q. Is that how it typically worked?

A. Yes.
Q. Do you recall where it was that you met or visited with Mr. Landrieu?
A. I don't have a specific recollection. I think it probably was in LaPlace.
Q. I didn't see anything written on here to tell me where you would have met. Do you have anything that you know of?
A. I don't have any specific recollection. Mr. Dugas can probably clarify that a little bit better.
Q. Do you know on May 15 of 2004, do you recall how many patients you may have seen on that date?
A. I do not.
Q. Do you know from the standpoint of Mr. Landrieu how long you would have actually seen Mr. Landrieu?
A. I would say maybe ten, fifteen minutes from the nature of the report that I have before me.
Q. Now, my understanding of taking your deposition previously is that for the persons who came in with you with Baycol, the way that you would do it is that you would go over the

history with them, but with respect to any sort of physical evaluation of the patient, you didn't do any physical evaluations.
A. On this particular patient it does not seem to be a physical form.
Q. What I mean by that is that you would not have, in a sense, done any sort of neurological examination of a patient at the time that you saw them?
A. Not if it was not warranted.
Q. In Mr. Landrieu's case, is there any indication that you would have done any sort of neurological examination of Mr. Landrieu?
A. There's no indication on the record that he was examined for that basis.
Q. And with respect to any sort of examination of Mr. Landrieu's musculature, is there any indication that you had done any sort of physical examination of Mr. Landrieu's musculature?
A. There is no indication that that was done.
Q. Now, the first page that I have here, which is SPFS000015jgl, there is some handwriting. The patient's name, Landrieu, Joseph. Is that Mr. Dugas's handwriting?

A. It looks like it.
Q. We don't have the original, so it's difficult to tell whether it's in two different types of ink, but am I correct in understanding that the better looking handwriting, which is more of a script handwriting, is your handwriting?
A. I think the better looking handwriting is always my handwriting.
Q. It's better looking than mine.
A. Mr. Dugas is a left-hander.
Q. So am I.
A. Are you?
Q. Let's not get into criticisms.
A. His handwriting is actually pretty clear here.
Q. And he's got printing, yes.
A. The darker handwriting is his basically.
Q. As an example on this first page, SPFS000015jgl, it has "What happened," and it has ".4 milligram Baycol 11/2000 to 7/2001." That's Mr. Dugas's handwriting?
A. That's correct.
Q. And then yours is the one "Stopped because of recall"?
A. Yes, with a misspelling of recall.
Q. Right. Okay. And then the second one, it

says "Treatment since incident," and you have "Debilitated." That's your handwriting?
A. Yes.
Q. A little bit below where you have the past history and you have these various things circled, all of that information, past history, that information is taken by Mr. Dugas?
A. Yes.
Q. Then we go to the next page which is SPFS000016jgl. Do you see that?
A. Yes.
Q. The Landrieu, Joseph at the top, that's going to be in Mr. Dugas's handwriting?
A. Yes.
Q. And the remainder of the page is going to be filled out by you?
A. Yes.
Q. All the circles were done by you?
A. Yes.
Q. With this SPFS000016jgl which has Medical Evaluation for Patients, am I understanding that what happens here is that you go through and meet with the patient, Mr. Landrieu, and you ask him questions as we go down here, and

you circle yes or no depending upon whatever his answers are?
A. That's correct.
Q. For example, where it says altered mental status, what sort of questions do you ask him there?
A. Mental problems, orientation as to time, place, short or long memory loss.
Q. You ask him whether or not he has any short or long --
A. Well, not in that way, but that's exactly what I'm referring to. I ask him if he has trouble remembering things, and I say for the short or the long. Perhaps we ask him whether or not they're oriented as to place and as to time, those other things, any irritability or violent behavior.
Q. When you ask him his mental status, his altered mental status, my understanding is you don't give him any sort of memory test. Is that right?
A. That's correct. I just ask him if his behavior is within the scope of what it was before he was taking medication.
Q. You don't do things such as ask him who is the

Q. Let's talk about myalgia. It says yes here. How did you find out whether or not he had myalgia?
A. He was questioned as to whether or not he had muscle pains, and he stated that he had had muscle cramps and muscle pains, and that was basically the information.
Q. The muscle pains and muscle -- let's talk about muscle pains. Did he indicate to you what parts of the body he had these muscle pains?
A. Yes, on the initial medical history form there's further elaboration of that. He said debilitated lower legs, and he also stated that he was getting weaker, that he could not go hunting anymore, and he could not play tennis. Again, you can infer that the reason for that was primarily the weakness and the discomfort that he was having.
Q. What does that say, the first page, lower legs -- what's after that?
A. I'm trying to read it myself. I thought I could always read my handwriting. Became something. I can't make it out.
Q. Is that became or become, do you know?

A. Perhaps if I had the original I would be able to tell, but I can't.
Q. Let's go on then. The next one, the second line on that same page, which we're reading from this treatment since incident, SPFS000015jgl, there's heart attack May 13, 2001, then there's a line that goes under it, getting weaker, cannot go hunting anymore, can't play tennis. Does that relate to his heart attack?
A. Yes, that is true, that does relate to his heart attack apparently, according to the patient.
Q. He says he had a stent put in? That's what the last part of that says?
A. Yes, right.
Q. So, myalgia, going back to this SPFS000016jgl, the medical evaluation where it says adverse symptom patterns, and Number 3 it has myalgia, and you circled yes. Do you know -- the muscle pains that we're talking about, from what you understand in looking at the first page, those would have been the lower legs?
A. Well, I thought that was basically it, but it might have been other areas involved. Usually

when patients complain of myalgia, they usually refer to the upper or lower extremities.
Q. But as we sit here today in looking at your notes, do you have any idea whether or not the myalgia was in the upper or lower extremities?
A. I have no recollection.
Q. Myalgia, do you know whether or not the myalgia still persists?
A. Again, I have no recollection of that. The patient stated it is a complication.
Q. So it could have been that the myalgia, he experienced that while he was on Baycol, but it stopped after he stopped Baycol?
A. It could have been.
Q. Then muscle weakness, you have progressive.
A. Yes.
Q. What does that mean?
A. That would -- probably I would infer from that that he probably was still having problems with feeling muscle weakness, but in virtue of the fact that he had also had a heart attack, I think that that would be a contributing factor.
Q. So the heart attack would be a contributing

factor for his progressive --
A. I would think so, especially if he related that.
Q. On the first page he seems to relate his muscle weakness to the heart attack?
A. He relates his inability to hunt and play to his heart attack.
Q. And the muscle weakness, do you know what part of the body he considered to be weak?
A. I do not have any recollection of that, but again, I would infer that it would probably be related to the upper or lower extremities.
Q. But insofar as whether it was strictly the lower extremities as opposed to the upper extremities, you don't have any indication of that?
A. I have no indication of that.
Q. Then you have Number 5, tenderness, swelling and discoloration of skin. You indicated no?
A. That's correct.
Q. So what do you do there? You ask him look, do you have any changes in the color of your skin?
A. Yes, basically.
Q. Then we go down to the skeletal. It's got

Q. Now, neurological you have certain types of things that are -- let's go back to skeletal first where it has muscle cramps. What part of his body was he having muscle cramps, do you know?
A. No. Most of the time, again, patients complain of cramps in the legs primarily, but they can happen elsewhere. I did not elaborate.
Q. And as far as whether or not he was still having muscle cramps, you don't know that?
A. I did not elaborate.
Q. Number 11, neurological, you have tremor, dizziness, memory loss, vertigo, anxiety, insomnia, depression.
A. Yes. And this would also perhaps explain the altered mental status situation.
Q. Then you have here -- look at the bottom. You have Reproductive: Loss of libido.
A. Yes.
Q. As far as Number 14, Skin, you scratched that out because, to your knowledge, he didn't have any skin problems?
A. That's correct.
Q. He didn't relate any to you?

does have glaucoma, that it has nothing to do with Baycol?
A. Yes.
Q. Now, Parkinson's disease. With respect to Parkinson's disease, Mr. Landrieu, if he does have Parkinson's disease, that is a condition which can indeed cause you to have muscle-related problems, is that correct?
A. Yes.
Q. And also nerve-related problems?
A. Yes.
Q. Now, this Parkinson's disease, when you talk about in your medical evaluation that -- this is SPFS000016jgl. You have neurological and you have tremor. A tremor certainly can be attributed to Parkinson's disease?
A. Yes.
Q. Same with dizziness, memory loss, vertigo, anxiety, insomnia, depression, all of those can be attributed to Parkinson's disease?
A. Yes.
Q. Now, Doctor, with respect to Mr. Landrieu, you're not going to provide any opinion, are you, Doctor, that Baycol had anything to do with his Parkinson's disease, are you?

A. No.
Q. So it's your opinion that more likely than not Baycol had nothing to do with Parkinson's disease?
A. Yes.
Q. Now, Parkinson's disease, is that a progressive disease?
A. Yes.
Q. So over time those particular conditions that he has will become worse?
A. Yes.
Q. When you put in here in your medical evaluation, which is SPFS000016jgl, and it has muscle weakness progressive, that -- not only could that be the heart attack, but that could also be his Parkinson's disease?
A. Yes.
Q. From the standpoint of your documents, this medical history form which is SPFS000015jgl, and then the medical evaluation SPFS000016jgl, there is a typewritten report which looks to be this SPFS000002jgl. Do you see that? It's the second page of your stack there.
A. This one?
Q. Second page. Oh, you may have taken it off.

effects of Baycol, in relation to any other illness are hard to isolate as one isolated instance. Now, I do not have on my handwritten report any mention of back pain as such, so I don't know how that got generated into back pain.

Q. This is why I asked you the question. Remember we said the indication is that Mr. Landrieu started Baycol in November of 2000, and I'll just show you the -- I'm going to show you this document that we have, and it's in your records too, I believe, just so that you'll have it and can look at it. This is from Doctor Myers' records, who you say that you have seen. It's DM000006jgl and DM000007jgl, and it's dated April 4th of 2000. Take a look at that.

A. Yes.

Q. In looking at this record, you see where it's dated April 4th of 2000?

A. Yes.

Q. Okay. This would be before the time that Mr. Landrieu started Baycol, correct?

A. Yes.

Q. So it indicates, does it not, Doctor, that Mr.